UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
EMILIO NOBLE,

                Plaintiff,

                                          Index No. 07 Civ. 5832 (KMK) (GAY)

-vs-

CAREER EDUCATION CORPORATION,

                Defendant.
-----------------------------------------------------X

**PLAINTIFF'S REPLY TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT**

1. Admit

2. Admit

3. Admit

4. Admit

5. Admit

6. Admit that the admissions office handled money, but deny that this was a primary responsibility of that office. Defendant's job description for the Admissions Director does not make reference to handling money. (Exhibit 5 to Kagan decl., at 00112). As admissions director, plaintiff rarely handled admissions fees. During plaintiff's tenure in this position, CEC's presidents were David Royka and Larry Stieglitz. During that time, admissions fees were usually paid directly to the Office Manager, Jackie Montcrieffe. In her absence, fees were handled by CEC's financial office or the plaintiff. (Noble aff. ¶ 4 [Exhibit 10 to Bergstein aff.]). Consistent with plaintiff's account, Lisa Masse testified that plaintiff temporarily handled "small sums of money" when students paid application fees if the

business office was closed. (Masse dep. 7 [Exhibit 2 to Bergstein aff.]). Larry Stieglitz testified:

Q: Did [Noble] handle money as director of Admissions?

A: Probably on occasion. There was an application fee. So the times I can think he might have been handling money was when a student was paying an application fee, and it's supposed to go to the business manager. The business manager is either not there at that point or engaged in something, so on occasions he could be holding the money until the business manager is there so he can give it to him or him [sic]. (Stieglitz dep. at 14 [Exhibit 3 to Bergstein aff.]).

Moreover, in his capacity as Director of Admissions, no one at CEC ever accused plaintiff of any impropriety in the handling of student money. (Noble aff. ¶ 4). Management deemed plaintiff an honest employee. (Stieglitz dep. at 15; Masse dep. 7-8).

7. Admit

8. Admit that the admissions office handled money, but for the reasons outlined in ¶ 6, deny that this was a primary responsibility of that office.

9. Admit

10. Admit

11. Admit

12. Admit

13. Admit that defendant wanted the re-certification process to run smoothly, but deny that terminating plaintiff had anything to do with that goal. As outlined in Winn Sanderson's affidavit, the Accrediting Bureau of Health Education Schools was concerned about ethical problems in defendant's admissions office, such as misrepresenting the school's programs to students. (Sanderson aff. ¶ 14 [Exhibit

2

   4 to Bergstein aff.]). Defendant does not accuse plaintiff of any unethical activity as Admissions Director, and his criminal conviction had nothing to do with his tenure at CEC. Moreover, ABHES's Accreditation Manual states that the school's management should "demonstrate[] ethical and responsible practices." (Exhibit 1 to Sanderson aff., at Section D (IV.D.1.b.). As these guidelines address the professionalism of the school's administrative staff, the factfinder may conclude they cannot reasonably be interpreted to include plaintiff's criminal conviction, particularly since management trusted plaintiff and deemed him an honest employee. (Stieglitz dep. at 15; Masse dep. 7-8). Plaintiff was present during the ABHES certification process and does not recall anyone raising issues concerning the handling of student money. Instead, that agency focused on CEC's programs and some concerns about the enrollment process which transpired before plaintiff began working there. (Noble aff. ¶ 5). Any argument that defendant fired plaintiff in order to appease ABHES is refuted by its failure to properly investigate the criminal record of a comparator, Marlene Shemtob-Battocchio, even though defendant acknowledges (Rule 56.1 ¶ 10) that ABHES periodically reviews defendant's program to determine whether it complies with ABHES's ethical requirements. See, plaintiff's reply to defendant's Rule 56.1 ¶ 19.

14.  Admit that plaintiff was hired on November 10, 2003. As Career Education Corporation operates Sanford Brown Institute (see, Def's Rule 56.1 ¶ 1), defendant's argument that plaintiff never worked for CEC is a semantic exercise.

3

15. Admit

16. Admit

17. Admit

18. Admit

19. Denied. While defendant maintained a written policy against employing persons with a felony record, a reasonable factfinder may conclude that defendant did not consistently enforce this policy. On May 25, 2005, CEC received another unsolicited email about an employee's criminal record. Sent to various SBI managers and agents, this email consisted of an article reprint from September 1996. It stated that Marlene Shemtob-Battocchio pled guilty to second degree grand larceny in connection with her prior employment in a doctor's office in New Rochelle, New York. Shemtob-Battocchio pled guilty in Westchester County Court after admitting to embezzling $464,000 from Drs. John Perugini and Sanford Mossberg. The article further identified the attorneys for the victims and the date of her sentencing. (Exhibit 1 to Sanderson dep.). When defendant received this email, Shemtob-Battocchio was a CEC faculty member who also handled administrative responsibilities for externship placements. (Sanderson dep. 12-13; Stieglitz dep. 21-22). Intending to find out who sent the email, she brought it to Sanderson's attention and told him "that it was a lie." (Sanderson dep. 15). Two weeks later, after CEC tried to determine who sent the email, Shemtob-Battocchio again approached Sanderson about it. At that time, Sanderson asked her if the email was true. Shemtob-Battocchio again said the

email was false and "that somebody was trying to smear her." (Sanderson dep. 16-17). Seven to 10 days later, she again spoke to Sanderson, advising that her attorney would "write a document indicating that I do not have a felony." Id. at 17. Sanderson received that letter on July 6, 2005. It reads:

> I write at the request of Marlene Battocchio. This office has been the family attorney for many years. I am not aware of any criminal charges currently pending against Ms. Battachio. (Exhibit 2 to Sanderson dep.).

While the Human Resources Director, John Regan, did not ask Sanderson to verify the email, Sanderson was suspicious when he read the attorney's letter because it addressed Shemtob-Battocchio's criminal record in the present tense. (Sanderson dep. 19). At that point, Sanderson decided to search the public records. Id. More than a month after he received the letter from Shemtob-Battocchio's lawyer, on August 19, 2005, Sanderson asked the Office of Court Administration whether she had a criminal record. (Exhibit 3 to Sanderson dep.; Sanderson dep. 20-21). However, although the email cited Shemtob-Battocchio's hyphenated name (Exhibit 1 to Sanderson dep.), Sanderson did not ask OCA to search for "Marlene Shemtob." The search was limited to "Marlene Battachio." (Exhibits 3-4 to Sanderson dep.; Sanderson dep. 23). The search revealed that Shemtob-Battocchio had a clean record. (Exhibit 3 to Sanderson dep.; Sanderson dep. at 22). At that point, Sanderson ceased any effort to verify whether Shemtob-Battocchio had pled guilty to a felony, determining that the response from OCA, Office of Court Administration, sufficed to end the inquiry. (Sanderson dep. 22). However, although the email was an "article reprint" that contained details about

5

Shemtob-Battocchio's criminal acts, Sanderson did not try to further explore whether it was true. He did not call the District Attorney's office. Nor did he call the attorney for the doctors who were victimized by Shemtob-Battocchio, or the doctors themselves. Sanderson explained that once the OCA search came up empty, "I did not see any cause to take any action." (Sanderson dep. 22). Although a felony is grounds for termination (Sanderson dep. 23-24), the parties do not dispute that Shemtob-Battocchio was not terminated in connection with the email. Sanderson further claimed that she would have been fired had he known that Shemtob-Battocchio did have a felony record. (Sanderson dep. 23-24). In fact, Shemtob-Battocchio was guilty of Grand Larceny, after all. Plaintiff's counsel searched her criminal record through the name "Marlene Shemtob." That search verified the contents of the article reprinted in the email, showing that this CEC employee pled guilty to that crime on September 10, 1996 in Westchester County Court. (Exhibit 6 to Bergstein aff.).

20. Denied, for the reasons outlined in plaintiff's reply to defendant's Rule 56.1 ¶ 13.

21. Denied, for the reasons outlined in plaintiff's reply to defendant's Rule 56.1 ¶¶ 13 and 19.

22. Admit

23. Admit that Carlos Arias replaced plaintiff as Admissions Director, but affirmatively allege that he was already working for CEC at the time and that he was not hired specifically to replace plaintiff. (Plaintiff aff. ¶ 6).

24. Admit that plaintiff bases his disparate treatment claim on the fact that Marlene

Shemtob-Battocchio was not terminated despite her criminal conviction. Plaintiff is not using Mike Poses as a comparator.

25. Admit that Shemtob-Battocchio worked as an instructor and that she also handled administrative responsibilities for externship placements. (Sanderson dep. 12-13; Stieglitz dep. 21-22).

26. Admit

27. Admit

28. Admit

29. Admit, although plaintiff argues that defendant did not properly investigate Shemtob-Battocchio's record even though it had reason to know she had a felony record. See, plaintiff's reply to defendant's Rule 56.1 ¶ 16.

30. Deny that Sanderson had no reason to doubt the results of the background check were accurate. See, plaintiff's reply to defendant's Rule 56.1 ¶ 16. Morever, any argument that defendant fired plaintiff in order to appease ABHES is refuted by its failure to properly investigate the criminal record of a comparator, Marlene Shemtob-Battocchio, even though defendant acknowledges (Rule 56.1 ¶ 10) that ABHES periodically reviews defendant's program to determine whether it complies with ABHES's ethical requirements. See, plaintiff's reply to defendant's Rule 56.1 ¶ 19.

31. Admit, but for the reasons outlined in plaintiff's reply to defendant's Rule 56.1 ¶ 16, the factfinder may conclude that defendant did not check Shemtob-Battocchio's background in good faith.

7

32. Admit

33. Admit

34. Admit

35. Admit

36. Admit, in part. Plaintiff recalls that Edgar Cifuentes was a registrar representative and not part of senior management. The only senior management was Larry Stieglitz, Dr. Nanci Coppola, Jackie Montcrieffe, Michael Mangual, Michelle Rawlins and Carol Campbell. Alfred Ragucci was hired to replace Dr. Coppola. (Noble aff. ¶ 7).

37. Admitted, but plaintiff notes that he had no reason to believe that his termination was discriminatory until he learned in December 2005 that Shemtob-Battocchio was not fired despite her comparable criminal conviction. (Exhibit 18 to Kagan decl., at 00118 ¶ 6; Plaintiff dep. at 34).

38. Denied that EEOC mailed to plaintiff the Right to Sue Letter on February 27, 2007. As outlined in the accompanying Bergstein affirmation and the exhibits annexed thereto, EEOC did not mail the letter until May 27, 2008.

Dated: September 5, 2008

Respectfully submitted,

/s Stephen Bergstein
STEPHEN BERGSTEIN

BERGSTEN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
Counsel for plaintiff