UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMILIO NOBLE,

                          Plaintiff,

            -v-

CAREER EDUCATION CORPORATION,

                          Defendant.

Case No. 07-CV-5832 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Stephen Bergstein, Esq.
Bergstein & Ullrich, LLP
Chester, NY
*Counsel for Plaintiff*

Amber L. Kagan, Esq.
Morgan, Lewis & Bockius LLP
New York, NY
*Counsel for Defendant*

Kirsten Milton Evans, Esq.
Morgan, Lewis & Bockius LLP
Chicago, IL
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Emilio Noble ("Plaintiff") brings this action alleging discriminatory termination by

Career Education Corporation ("Defendant" or "CEC"), the parent company of Plaintiff's former

employer, the Sanford Brown Institute ("SBI"). Plaintiff claims that Defendant fired him

because of his race and national origin, in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e *et seq.*; the New York Human Rights Law ("NYHRL"), N.Y.

Exec. Law § 290 *et seq.*; and 42 U.S.C. § 1981 ("Section 1981").[1]  Defendant has moved for

summary judgment.  For the reasons stated herein, Defendant's motion is granted.

## I.  Background

### A.  Plaintiff's Employment and Termination

SBI is a post-secondary educational institution that offers "programs, degrees and

certificates in a variety of healthcare fields."  (Def.'s Rule 56.1 Statement of Undisputed

Material Facts ("Def.'s 56.1") ¶¶ 1, 3.)  Plaintiff, a Hispanic male of Dominican descent (Compl.

¶ 2), was hired by SBI on or about November 10, 2003, as an Admissions Representative (Def.'s

56.1 ¶ 14).  On or about May 3, 2004, upon the recommendation of Lisa Masse, then a CEC Vice

President, SBI promoted Plaintiff to the position of Director of Admissions, a "'senior

management position.'"  (*Id.* ¶¶ 15, 35; Affirmation of Stephen Bergstein in Opp'n to Def.'s

Mot. for Summ. J. ("Bergstein Aff.") Ex. 2 (Dep. of Lisa Masse ("Masse Dep.") 8).)  In that

position, as the "most senior person in the . . . Admissions Department," Plaintiff was

responsible for, inter alia, monitoring the performance of Admissions Representatives,

developing the Admissions Department's budget, ensuring compliance with Defendant's policies

and state and federal laws, and "overseeing the collection of student application fees."  (Def.'s

56.1 ¶¶ 7-8.)  According to Masse, she believed Noble to be "a true professional" and "a real

gentleman," and she was "very happy with his performance as [Director of Admissions]."

(Masse Dep. 8.)  Larry Stieglitz, who was the President of SBI during part of Plaintiff's tenure as

Director of Admissions, said that he "thought [Plaintiff] was a decent Admissions director."

---

[1] This Court previously dismissed Plaintiff's claim that Defendant terminated him due to
his prior criminal conviction, in violation of New York Correction Law §§ 752 and 753.

(Bergstein Aff. Ex. 4 (Dep. of Larry Stieglitz ("Stieglitz Dep.") 10).)

On October 29, 2004, Masse received an email from Howard Henson, a former SBI employee, "indicating that Plaintiff had been convicted of grand larceny in connection with his prior employment." (Def.'s 56.1 ¶ 16; Bergstein Aff. Ex. 1 (Dep. of Emilio Noble ("Pl. Dep.") 55).) Masse forwarded the email to two other CEC officials — John Regan, CEC Regional Director of Human Resources, and Ron Kimberling, another CEC Vice President — and asked for their advice on how to proceed. (Def.'s 56.1 ¶ 17; Decl. of Amber Kagan in Supp. of Mot. for Summ. J. ("Kagan Decl.") Ex. 10, at first unnumbered page.) According to Stieglitz, he also learned of the allegation, possibly from Masse, and told Masse to "[k]eep [him] posted." (Stieglitz Dep. 12-13.) Plaintiff also received a copy of Henson's email on the same day that it was sent to Masse. (Pl. Dep. 56-57.) "Almost immediately" after Masse received Henson's email, Plaintiff approached Stieglitz and admitted that he had been convicted of grand larceny in or around July 2004.[2] (Def.'s 56.1 ¶ 18; Pl. Dep. 56 (stating that Plaintiff "confronted" Stieglitz "after this e-mail was sent, I think it was the day after").)

Following Masse's receipt of Henson's email, a decision was made to terminate Plaintiff. (Def.'s 56.1 ¶ 21.) According to Masse and Stieglitz, they were not involved in the decision, which they believed was made by Human Resources or "corporate" staff at Defendant's home office in Illinois. (Masse Dep. 11; Stieglitz Dep. 17.) On November 1, 2004, Kimberling

---

[2] There is some discrepancy in the record as to the timing of Plaintiff's conviction. While the Parties agree that Plaintiff told Stieglitz that his conviction was "in or around July 2004" (Def.'s 56.1 ¶ 18), Plaintiff's Complaint alleges that Defendant learned that Plaintiff was convicted in May 2004 (Compl. ¶ 12). According to Plaintiff, he had been arrested in March 2003, pled guilty to a charge of grand larceny on April 26, 2004, was convicted in May 2004, and was sentenced on July 22, 2004. (Pl. Dep. 52-54; Compl. ¶ 12.)

forwarded Masse's email to Regan, along with the message, "We need to talk about this today."
(Kagan Decl. Ex. 10, at fifth unnumbered page.)  On November 12, 2004, Regan sent Masse an
email with a "brief script" for notifying Plaintiff of his termination.  (*Id.* at sixth unnumbered
page; *id.* at seventh unnumbered page ("*Lisa*:  'You are aware of our management's review of
the information we became recently aware of with regard to your guilty plea in the felony
conviction.  We have carefully reviewed this information [and] have made the business decision
to terminate your employment effective today.'").)

It was Masse's "understanding that [Plaintiff] was fired based on [his grand larceny]
conviction," pursuant to the CEC "policy with respect to employees with criminal convictions
. . . that the home office HR team used in conjunction with background clearances."  (Masse
Dep. 12.)  According to Defendant's written hiring policies, among the "'firm' reasons not to
hire a candidate" for any position is "[a]ny felony conviction in the last seven years."  (Kagan
Decl. Ex. 11.)  According to Winn Sanderson, who replaced Stieglitz as President of SBI in
White Plains in February 2005, "CEC policy is that [employees or applicants] are terminated or
not hired" if they have a felony "criminal conviction."  (Kagan Decl. Ex. 2 (Dep. of Winn
Sanderson ("Def.'s Sanderson Dep.") 11; Bergstein Aff. Ex. 3 (Dep. of Winn Sanderson ("Pl.'s
Sanderson Dep.") 5, 11).)[3]  According to Regan, Defendant has "a policy . . . concerning the
employment of individuals with felony convictions."  (Decl. of John Regan in Supp. of Def.'s
Mot. for Summ. J. ("Regan Decl.") ¶ 9.)

According to Regan, the decision to terminate Plaintiff's employment was "based on"

---

[3] "Def.'s Sanderson Dep." and "Pl.'s Sanderson Dep." refer to a single deposition; the
Court distinguishes them because the Parties' respective exhibits excerpted different pages from
the deposition and because Defendant attached exhibits to the deposition.

Defendant's "conviction policy" as well as its "concern[] that Plaintiff's conviction, if discovered by [the Accrediting Bureau of Health Education Schools ('ABHES')], could have created issues with the [ABHES] certification visit" scheduled at that time. (*Id.* ¶¶ 6, 8, 10.) SBI must comply with ABHES requirements to maintain its accredited status and remain eligible for certain federal funding. (Def.'s 56.1 ¶ 11.) ABHES conducts at least one certification visit every six years for institutions such as SBI. (*Id.* ¶ 10.) During a certification visit to a school, ABHES evaluates, inter alia, "the qualifications of the school's management team." (*Id.*) In "the fall of 2004," SBI was "on probation and at risk of losing its accredited status," and was scheduled for an ABHES certification visit. (*Id.* ¶ 12.) The SBI Admissions Department was of "primary concern" to ABHES, as the department had been "perceived as experiencing ethical problems." (*Id.*) SBI's probationary status made it "particularly important" that the "ABHES certification visit ran smoothly" and without any "significant issues." (*Id.* ¶ 13.)

Plaintiff was informed of his termination on or about November 30, 2004. (*Id.* ¶ 22.) At this time, Plaintiff did not believe that his termination was discriminatory. (*Id.*) Carlos Arias, a Hispanic employee of CEC, was appointed to replace Plaintiff as SBI Director of Admissions. (*Id.* ¶ 23; Pl.'s Reply to Def.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶ 23.) At least one other Hispanic employee, Michael Mangual, held a senior management position at SBI during Plaintiff's employment and remained employed there at the time of Plaintiff's termination.[4]

---

[4] According to Regan, two other Hispanic employees, Edgar Cifuentes and Pamela Doles, served in SBI's senior management at the time of Plaintiff's termination. (Def.'s 56.1 ¶ 36; Regan Decl. ¶ 12.) According to Plaintiff, Cifuentes was a "registrar representative" and not a member of senior management. (Pl.'s 56.1 ¶ 36.) Plaintiff does not specifically address Doles's employment status, but states that he and seven other named individuals (not including Doles) comprised "[t]he only senior management." (*Id.*) Thus, Plaintiff's position is that two of eight senior management positions at SBI were filled by Hispanics (*id.*), while Defendant asserts that

(Def.'s 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.)

      B.  Employment and Termination of Marlene Shemtob-Battocchio

      Marlene Shemtob-Battocchio ("Battocchio"), a white former SBI employee, worked as an Instructor at SBI.[5]  (Def.'s 56.1 ¶¶ 24-25.)  Her position as an Instructor included "administrative responsibilities for [student] externship placements."  (Id. ¶ 25; Pl.'s 56.1 ¶ 25.)  According to Sanderson, Battocchio was also responsible for "teaching the program curriculum [and] providing academic advisement and career-related counseling to students," but did not "handle cash."  (Decl. of Winn Sanderson in Supp. of Mot. for Summ. J. ("Sanderson Decl.") ¶¶ 18-19.)

      On or about May 25, 2005, various SBI and CEC employees received an email indicating that Battocchio had been convicted of grand larceny on or around September 11, 1996.  (Def.'s 56.1 ¶ 26.)  The email was apparently carbon-copied to "mbattacchio@sbwhiteplains.com."  (Def.'s Sanderson Dep. Ex. 1.)  The first line of the body of the email was "Article Reprint," the second line began "Date=09/11/1996," and the third line stated "Secretary pleads guilty to

_____

three of eleven such positions were filled by Hispanics (Def.'s 56.1 ¶ 36).  The dispute has no impact on the instant motion.

    [5] The Court will refer to this individual as "Battocchio," which is the spelling used by both Parties in their Rule 56.1 submissions.  However, the correct spelling of her name is somewhat unclear in the record, as documents in the record indicate at least three different spellings.  First, a letter from Battocchio's family attorney spelled her name "Battocchio." (Kagan Decl. Ex. 13.)  Second, CEC paperwork indicating that Battocchio's employment with CEC was terminated effective August 3, 2007 spelled her name "Battochio."  (Kagan Decl. Ex. 15.)  Finally, several documents used the spelling "Battacchio," including (1) the April 8, 2003 letter from SBI's predecessor school formally offering her a position as an instructor (Kagan Decl. Ex. 12), (2) the May 25, 2005 email indicating that she was a convicted felon (which was also carbon-copied to "mbattacchio@sbwhiteplains.com") (Def.'s Sanderson Dep. Ex. 1), and (3) the results of Sanderson's search of the New York State records for her criminal record (Def.'s Sanderson Dep. Ex. 3).

stealing from doctors." (*Id.*)  According to the email, "37-year-old Marlene Shemtob-Battacchio

of Yonkers" pled guilty "[y]esterday" to "second-degree grand larceny in [a] scheme" to steal

$464,000 from two named doctors who had been her employers. (*Id.*)  By the time the email was

sent, SBI had completed the ABHES certification visit that had been scheduled as of fall 2004.

(Def.'s 56.1 ¶ 26.)  Subsequent to this email being sent, Battocchio approached Sanderson on

"several occasions" and "denied that she had been convicted of grand larceny." (*Id.* ¶ 27.)

According to Sanderson, Battocchio "emphatically and repeatedly denied having been convicted

of any crime." (Sanderson Decl. ¶ 21.)  Sanderson testified that he discussed the email with

Regan, who did not ask him to take any action to determine the truth of the email's contents.

(Pl.'s Sanderson Dep. 18-19.)

On or about July 6, 2005, Battocchio provided Sanderson with a letter from her attorney,

stating, "'I am not aware of any criminal charges currently pending against Ms. Battocchio.'"

(Def.'s 56.1 ¶ 28.)  According to Sanderson, he faxed the letter to Regan. (Pl.'s Sanderson Dep.

19.)  Noting the phrase "'*currently* pending,'" Sanderson "decided to run a search of the public

records to verify that Battocchio did not have a criminal conviction." (Def.'s 56.1 ¶ 28

(emphasis added).)  On or about August 17, 2005, Sanderson "ran a criminal background search"

on Battocchio, identifying her as "Shemtob-Battacchio, Marlene," born December 10, 1955. (*Id.*

¶ 29; Def.'s Sanderson Dep. Ex. 4.)  The search cost of $52 was billed to SBI. (Def.'s Sanderson

Dep. Ex. 5.)  The search produced a "Job Status Report" from the New York State Office of

Court Administration ("OCA") stating "No Results Found" for "Shemtob-Battacchio, Marlene."

(Def.'s Sanderson Dep. Ex. 3; Def.'s 56.1 ¶ 29.)  The report also stated:  "Search results are

based on finding an *exact match* of the *name* and *date of birth* submitted." (Def.'s Sanderson

Dep. Ex. 3.)

According to Sanderson, following his receipt of this report, he "did not see any cause to take any action." (Pl.'s Sanderson Dep. 22.) He did not contact the Westchester District Attorney's office (which had been mentioned in the email as the office that had prosecuted "Marlene Shemtob-Battacchio"), or the doctors named in the email as victims, or the doctors' lawyer, or Battocchio's lawyer (who had written the July 6, 2005 letter), or the White Plains courthouse, or any of the other individuals who had received the email. (*Id.* 22-23, 25-26.)

The Parties agree that "[i]f Sanderson had been aware that Battocchio [had been] convicted of a felony, he would have terminated her employment." (Def.'s 56.1 ¶ 31.)

On or about August 3, 2007, SBI terminated Battocchio's employment for reasons unrelated to her felony conviction. (*Id.* ¶ 32.) According to Sanderson, he terminated her because she had failed to fulfill the "requirements" to "continue to be licensed by the State." (Def.'s Sanderson Dep. 14.)

According to Plaintiff's counsel, his office obtained an OCA Job Status Report, dated April 16, 2008, finding results for an individual identified as "Shemtob, Marlene" with the date of birth December 18, 1958. (Bergstein Aff. ¶ 7; *id.* Ex. 6, at first unnumbered page.) The report indicated that Shemtob was arrested on March 26, 1996 and pled guilty to second-degree grand larceny on September 10, 1996. (Bergstein Aff. Ex. 6, at third unnumbered page.)

C.  Procedural History

According to Plaintiff, on December 23, 2005, he "learned that [Battocchio] had possibly been convicted of a crime." (Pl. Dep. 34.) On August 8, 2006, he filed a charge of discrimination with the EEOC and the New York State Division of Human Rights. (Bergstein

8

Aff. Ex. 10 (Decl. of Pl. in Opp'n to Mot. for Summ. J. ("Pl. Decl.") ¶ 1); Kagan Decl. Ex. 18

("EEOC Compl.").)  Plaintiff's complaint stated that he resided at 5 Henry Street, Wappingers

Falls, New York.  (EEOC Compl., at first-second unnumbered pages.)  According to Plaintiff's

current counsel, he sent the EEOC a letter dated February 13, 2007, stating that his firm

represented Plaintiff and that he was "writing to request a Notice of Right to Sue letter."

(Bergstein Aff. ¶ 11; *id.* Ex. 8.)  The EEOC issued Plaintiff a "Notice of Right to Sue" dated

February 27, 2007.  (Def.'s Sanderson Dep. Ex. 6.)  The notice indicated that it was addressed to

Plaintiff at 5 Henry Street, Wappinger Falls, New York.  (*Id.*)  According to Plaintiff, he never

received the notice.  (Pl. Decl. ¶ 2.)  Plaintiff's counsel sent the EEOC another letter, dated May

24, 2007, stating that his law firm represented Plaintiff, again asking the EEOC "to issue a Right

to Sue letter."  (Bergstein Aff. ¶ 12; *id.* Ex. 9.)  According to Plaintiff's counsel, his office

received the February 27, 2007 Notice of Right to Sue on May 27, 2008.  (Bergstein Aff. ¶ 13.)

Plaintiff filed the instant Complaint on June 20, 2007, alleging violations of Title VII,

Section 1981, "the New York Executive Law," and "New York Correction[] Law §[§] 752-53."

(Compl. ¶¶ 25-27.)  The case was assigned to this Court on August 6, 2007.  On November 29,

2007, the Court granted Defendant's motion to dismiss Plaintiff's New York Correction Law

claim.  The Court subsequently denied Plaintiff's request for interlocutory appeal as to his state

Correction Law claim.  Defendant's motion for summary judgment on all remaining claims

followed.  Oral argument was held on July 29, 2009.

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*; *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . [T]rial courts should not treat discrimination differently from other ultimate questions of fact." (internal quotation marks omitted)).

B.  Title VII

Plaintiff claims that his employment was terminated "because of his national origin" in violation of Title VII. (Compl. ¶ 25.) Defendant argues that no reasonable jury could find that Plaintiff's termination was discriminatory. Plaintiff contends that a reasonable jury could find that his termination was motivated by discrimination in light of the evidence that although Plaintiff was terminated in 2004 following his admission that he was convicted of grand larceny, Battocchio — a white employee — was not terminated following accusations in 2005 that she had also been convicted of grand larceny. The Court assumes *arguendo* that Plaintiff's claim is not time-barred.[6]

---

[6] Defendant contends that Plaintiff's Title VII claim is time-barred because he failed to file a charge of discrimination with the EEOC within 300 days of his termination and, in the alternative, because he failed to file his Complaint within ninety days of the date on which it can be assumed that he received a Notice of Right to Sue from the EEOC. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 9-11.) Plaintiff argues that his claim is not time-barred because he did not have any reason to suspect that his termination was discriminatory until he learned of Defendant's subsequent treatment of Battocchio, and because he did not actually receive a Notice of Right to Sue until after he filed the Complaint. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 6-9.) Because Title VII's administrative exhaustion requirement is not jurisdictional, *see Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir. 2000), the Court will not address the Parties' arguments as to whether the claim is time-barred, and instead

Because Plaintiff presents no direct evidence of discrimination, the Court considers Plaintiff's claim of Title VII discrimination under the "burden-shifting" framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Holcomb*, 521 F.3d at 138.  Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's [action] was in fact the result of . . . discrimination."  *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802) (internal citations omitted).

### 1.  Plaintiff's Prima Facie Case

A plaintiff satisfies his burden of establishing a prima facie case of employment discrimination if he introduces evidence that raises a reasonable inference that action taken by his employer was based on an impermissible factor.  In particular, a plaintiff must show that:  (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *See Holcomb*, 521 F.3d at 138; *Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008).

---

decides the motion on the merits, *see Khan v. HIP Centralized Lab. Servs., Inc.*, No. 03-CV-2411, 2007 WL 1011325, at *3 (E.D.N.Y. Mar. 30, 2007) ("It is not necessary to decide [the] issue [of whether plaintiff failed to exhaust his administrative remedies], because . . . plaintiff's . . . claim fails on the merits.").

Defendants do not contest that Plaintiff can satisfy the first three prongs of the prima facie test for his Title VII claim. Indeed, the record is clear that: (1) Plaintiff alleges discrimination on the basis of his national origin; (2) Defendant obviously agreed that Plaintiff possessed the qualifications to be SBI Director of Admissions (as he had been promoted to that position only months prior to his termination), and his supervisors felt that his job performance was at least adequate; and (3) there is no doubt that Plaintiff's termination was an adverse employment action. However, Defendant argues that Plaintiff has not demonstrated that the circumstances surrounding his termination permit an inference of discriminatory intent.

Plaintiff's burden in demonstrating the fourth prong of the prima facie test poses a "low threshold, which the Supreme Court has described as 'minimal.'" *Holcomb*, 521 F.3d at 139 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506). A plaintiff "may rely on direct evidence of what the defendant did and said in satisfying [his] initial burden under *McDonnell Douglas*" to establish an inference of discriminatory intent, such as, "for instance, . . . evidence that the employer had told the employee that he was being fired because of his age." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (internal quotation marks omitted). In this case, Plaintiff has presented neither direct evidence of discriminatory intent nor evidence such as jokes or remarks suggestive of discriminatory animus; thus, the Court considers Plaintiff's claim of disparate treatment. *See Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 291 (S.D.N.Y. 2008) ("[D]irect evidence of discrimination is unnecessary to establish a discriminatory animus. Instead, it is well established that a discriminatory animus may be proven both by direct and by indirect evidence, for example, by showing that similarly-situated [comparators] were treated more favorably than plaintiff.").

"A showing of disparate treatment — that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quoting *Graham*, 230 F.3d at 39). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Id.*

In an effort to establish an inference of discriminatory intent, Plaintiff relies solely on evidence that he was similarly situated to Battocchio and that they were treated differently. Plaintiff acknowledges that Sanderson did not actually know that Battocchio had been convicted of a felony, and that he would have fired Battocchio had he known. (Pl.'s 56.1 ¶ 31.) Plaintiff's claim is thus that because Battocchio was white, Sanderson and others avoided learning about Battocchio's felony conviction: "A rational jury may . . . conclude that management did not take the email [about Battocchio] seriously and conducted a half-hearted investigation into its accuracy." (Pl.'s Mem. 14.) Specifically, according to Plaintiff, "defendant failed to take . . . easy steps in verifying [Battocchio's] record," and this "failure to further investigate [Battocchio's] background reflects that [Defendant] did not strictly enforce its felony-termination policy" and "may . . . be explained by race, as plaintiff is Hispanic and [Battocchio] is white." (*Id.* 15.)

No rational jury could find that Defendant's failure to further investigate Battocchio's background raises an inference that Plaintiff's termination was motivated by discrimination, as

Plaintiff has produced no evidence that he was treated less favorably than Battocchio.  Plaintiff

argues that Defendant's investigation of Battocchio's alleged felony conviction was insufficient,

but there is no evidence in the record that Defendant conducted *any* investigation into the email

accusation that Plaintiff had been convicted of a felony.  The record evidence is that Masse

received Henson's email, forwarded it to Regan and Kimberling, and asked for their advice.

Masse's testimony was that she did not remember having any conversations with other CEC

administrators about the email, that she "strictly remember[ed] forwarding those e-mails . . . and

waiting for [a] reply on what the next steps were," and that she was not consulted thereafter.

(Masse Dep. 11.)  Stieglitz testified that he believed that he learned of the allegation from Masse,

that he told Masse to "[k]eep [him] posted as to what will happen next," that he did not

contemplate terminating Plaintiff's employment and "probably wouldn't" have done so "without

hearing something from corporate," and that Plaintiff subsequently "volunteered" to Stieglitz

that the allegation was true, i.e., that he had in fact been convicted of a crime.  (Stieglitz Dep. 12-

13.)  Plaintiff testified that he believed that he volunteered this information to Stieglitz "the day

after" the email was sent, i.e., October 30, 2004.  (Pl. Dep. 56.)  Defendant's email records

demonstrate that Regan and Kimberling intended to discuss the matter on November 1, 2004.

(Kagan Decl. Ex. 10, at fifth unnumbered page.)  Thus, not only is there no record evidence that

Defendant conducted any investigation into the allegations in Henson's email about Plaintiff's

possible criminal record, but also there apparently was no need to do any such investigation, as

Plaintiff had already admitted to his conviction by the time Defendant's administrators were

prepared to discuss the issue.  Nor is there any evidence in the record as to what type of

investigation — if any — Defendant would have undertaken if Plaintiff had not acknowledged

his felony conviction to Stieglitz, let alone if he had (like Battocchio) vigorously denied that he had been convicted.  Finally, while Plaintiff finds fault with the scope of Defendant's investigation into Battocchio's criminal history, there is no dispute that Defendant did inquire into the matter, which inquiry was met by repeated denials by Battocchio but which nonetheless involved running an independent criminal history check.[7]  Accordingly, there is no evidence from which a reasonable jury could find any disparate treatment of Plaintiff as compared to Battocchio.

Assuming, contrary to the evidence, that Defendant had undertaken or planned a significant investigation into Plaintiff's criminal history such that a reasonable jury could find that Defendant was more aggressive in investigating Plaintiff than in investigating Battocchio,[8] thus subjecting Plaintiff to disparate treatment, Plaintiff still would not raise an inference of discrimination sufficient to make out a prima facie case, because no reasonable jury could find that Defendant and Battocchio were similarly situated.

First, it is undisputed that Plaintiff had much greater job responsibilities than Battocchio. Plaintiff, in his role as Director of Admissions, was a member of SBI's senior management, and his responsibilities included supervising the Admissions Department and his subordinates in that

---

[7] Plaintiff asserts that in addition to confronting Battocchio and running a criminal history check, Defendant should have hunted down the criminal court file and/or sought additional information about the nine-year-old conviction from the District Attorney's office.  While in hindsight this might have seemed to be light work for Defendant, its failure to undertake such an investigation hardly shows that Defendant engaged in disparate treatment of Plaintiff, since Plaintiff admitted to the conviction while working for Defendant, without Defendant undertaking any additional investigation.

[8] The Court notes that Plaintiff apparently did not depose Regan, Kimberling, or anyone at CEC who may have been involved in the decision to terminate Plaintiff or in any alleged decision to investigate Plaintiff's criminal record.

department, developing the department's budget, ensuring compliance with company policies and state and federal laws, and collecting student application fees. By contrast, Battocchio, only an Instructor, taught students and handled some administrative tasks; there is no evidence that she supervised any other employees, handled any money, or made or enforced any company policy. Defendant plainly would have been more concerned about having a convicted larcenist in Plaintiff's position than having one in Battocchio's position. *Cf. Lee v. Poughkeepsie City Sch. Dist.*, No. 06-CV-4660, 2008 WL 852790, at *8 (S.D.N.Y. Mar. 31, 2008) (holding that plaintiff employee was not similarly situated to proposed comparators, where his "position was different [from theirs] in material ways").

Second, it is undisputed that Defendant had reason to be — and was — concerned about the ABHES certification visit that loomed at the time of the email accusations about Plaintiff's criminal record. Given that SBI was at risk of losing its accreditation, that ABHES had the power to take away that accreditation, and that ABHES was specifically concerned with the ethics of SBI's Admissions Department, there is no doubt that Defendant had a particular interest in determining whether the recently promoted Director of Admissions was a convicted felon. By contrast, the email allegations about Battocchio arose after this certification visit, with SBI no longer in immediate danger of losing its accreditation. (The Parties agree that SBI was due for at least one certification visit every six years, and there is no evidence in the record that another certification was scheduled to take place soon.) Moreover, there is no evidence in the record suggesting that ABHES would have a reason to be particularly concerned about the criminal record of an SBI Instructor.

Third, it is undisputed that Defendant's written policy regarding felony convictions

17

indicated that Defendant would not employ individuals with a felony conviction within the past seven years; thus, the policy applied to Plaintiff but not to Battocchio.  On or about October 30, 2004, Plaintiff acknowledged to Sanderson that he had been convicted of grand larceny in or around July 2004 — only three or four months earlier.  Thus, Plaintiff admitted not only that he had been convicted of a felony in the previous seven years, but also that he had been convicted *during* his tenure as SBI Director of Admissions, only weeks after his promotion to that position. By contrast, the email regarding Battocchio indicated that she had been convicted of grand larceny nearly nine years earlier, in 1996.  Although Sanderson testified — and Plaintiff concedes — that, notwithstanding the seven-year window in the written policy, he would have terminated Battocchio due to her 1996 conviction had he known about it (a fact which itself undermines any disparate treatment claim), there is no question that the difference in the timing of Plaintiff's and Battocchio's respective felony convictions negates any suggestion that Plaintiff and Battocchio were similarly situated, or that Defendant selectively applied its policy with respect to hiring felons convicted within seven years.

Therefore, both because Plaintiff was not similarly situated to Battocchio and because he was not treated disparately from Battocchio, Plaintiff has failed to make out a prima facie case of discrimination, entitling Defendant to summary judgment on Plaintiff's Title VII claim.

### 2.  Defendants' Nondiscriminatory Justification for Treatment of Plaintiff

Assuming *arguendo*, contrary to the Court's conclusion above, that Plaintiff has established a prima facie case of discrimination, Defendant has the burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff.  This Defendant has done, by offering evidence that, inter alia, Plaintiff had significant job responsibilities at SBI; Defendant

was concerned about ABHES's evaluation of the ethics of the SBI Admissions Department;
Plaintiff admitted to having been convicted of a felony within seven years; Defendant had a
policy not to employ individuals with felony convictions within seven years; and Defendant
decided to terminate Plaintiff based on this policy and on Defendant's concerns regarding the
ABHES certification visit.  (Def.'s 56.1 ¶¶ 7-8, 12-13, 18-21.)  *See Holcomb*, 521 F.3d at 141
(holding that defendant's burden of production was "satisfied by the testimony of
[decisionmakers] that they reached the decision [to terminate plaintiff] on race-neutral
grounds").

### 3.  Plaintiff's Proffer of Evidence Supporting a Finding of Discrimination

Assuming *arguendo* that Plaintiff has established a prima facie case of discriminatory
termination, in light of Defendant's proffer of a nondiscriminatory reason for terminating
Plaintiff, Plaintiff's claim can survive summary judgment only if he "has raised sufficient
evidence upon which a reasonable jury could conclude by a preponderance of the evidence that
the decision to fire him was based, at least in part, on the fact that" he was a Hispanic and/or a
person of Dominican descent, *Holcomb*, 521 F.3d at 141.  The Court concludes that Plaintiff has
not done so.  For the reasons stated above, *see supra* Section II.B.1, Plaintiff has adduced no
evidence from which a jury could reasonably infer that he was treated differently from a
similarly situated comparator on the basis of his race or national origin, and the undisputed
evidence in the record further negates the inference that Plaintiff was terminated on account of
his race or national origin.

First, Plaintiff was promoted to be SBI's Director of Admissions in May 2004, just six
months prior to his termination, a circumstance suggestive of a lack of discriminatory animus

toward Plaintiff.  *See Brady v. Calyon Sec. (USA)*, No. 05-CV-3470, 2007 WL 4440926, at *14

(S.D.N.Y. Dec. 17, 2007) (awarding defendant summary judgment on age discrimination claim

because, among other reasons, plaintiff "has presented no explanation, credible or otherwise,

why [defendant] would promote him while he was in the protected age class and then terminate

him a year later because of his age"); *Osborne v. Literacy Partners, Inc.*, No. 04-CV-6652, 2007

WL 2298354, at *4 (S.D.N.Y. Aug. 9, 2007) (granting summary judgment because, among other

reasons, plaintiff "has not described circumstances that would give rise to an inference of

discrimination," in light of the fact, inter alia, that plaintiff was "promoted at least twice prior to

her termination").  Defendant makes this argument in its briefing (Def.'s Mem. 14), and Plaintiff

does not address the point in his response.  The fact of Plaintiff's recent promotion is particularly

noteworthy in this case given Plaintiff's failure to identify the person or persons who made the

decisions to promote and to terminate Plaintiff; in the absence of such evidence, the Court can

only note that Masse both recommended Plaintiff for promotion in May 2004 and was involved

in Plaintiff's termination in November 2004 (to the extent that she forwarded Henson's email to

Regan and Kimberling, discussed the situation with Sanderson, and was apparently intended to

inform Plaintiff of his termination).  In that respect, the "same actor" inference strongly supports

the conclusion that Plaintiff has failed to establish a genuine issue of material fact as to whether

he was terminated due to discrimination.  *See Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir.

2003) (observing, in the context of age discrimination claims, that "when the person who made

the decision to fire was the same person who made the decision to hire, especially when the

firing occurred only a short time after the hiring, it is difficult to impute to him an invidious

firing motivation that would be inconsistent with his decision to hire"); *Schnabel v. Abramson*,

232 F.3d 83, 91 (2d Cir. 2000) (finding the "same actor" inference "highly relevant" and affirming a grant of summary judgment when there was a three-year gap between hiring and firing); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) (granting summary judgment because plaintiff failed to establish prima facie case, and holding that even if she did so she failed to defeat summary judgment at the final step of the *McDonnell Douglas* test in part because the same individual both promoted and fired plaintiff).

Second, the fact that Plaintiff was replaced as Director of Admissions by another Hispanic individual strongly discounts any inference of discriminatory animus on the basis of Plaintiff's Hispanic identity.  *See Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 556, 560 (S.D.N.Y. 2005) (awarding summary judgment on claim by "a black woman of Caribbean ancestry" that she was terminated on basis of her race, stating that "the fact that plaintiff was replaced by at least one other black nurse . . . undercuts any possible inference that [defendants'] remarks . . . admit of an inference that plaintiff was fired in circumstances suggesting discrimination"); *Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) (awarding summary judgment and noting that the fact "[t]hat a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination"). Plaintiff's only response to this argument is to cite *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985), for the proposition that it is "inappropriate" to "require[] an employee, in making out a prima facie case, to demonstrate that she was replaced by a person outside the protected class," *id.* at 995-96.  (Pl.'s Mem. 10-11.)  In *Meiri*, however, the plaintiff was not replaced by *anyone*, and the court noted that "adopt[ing] a mechanical approach . . . would . . . exempt from Title VII coverage an employer that, in furtherance of a broad-based policy of employment discrimination,

discharged one hundred minority employees, retained nine hundred non-minority employees, and, by making additional overtime available to the nine hundred retained employees, found it unnecessary to replace any of the discharged employees." *Meiri*, 759 F.2d at 996 n.9. Moreover, though the *Meiri* court found that plaintiff had satisfied her burden to state a prima facie case, it affirmed the district court's grant of summary judgment on grounds that plaintiff had shown "no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." *Id.* at 998. In the instant case, given the absence of any other evidence of discrimination, the fact that Plaintiff was directly replaced by another Hispanic employee undermines Plaintiff's assertion that a reasonable jury could find that Defendant terminated him because he was Hispanic.

Accordingly, even if Plaintiff had established a prima facie case of discrimination in violation of Title VII, Plaintiff has not presented any evidence from which a reasonable jury could find that Plaintiff's termination was motivated by discrimination, and Defendant is entitled to summary judgment at this third step of the *McDonnell Douglas* analysis.

C.  Section 1981

Plaintiff also alleges that Defendant violated Section 1981 by terminating Plaintiff because of his race.  (Compl. ¶ 26.)

Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (quoting 42 U.S.C. § 1981(a)).  "[D]iscriminatory intent is a necessary element of a § 1981 claim." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 368 (S.D.N.Y. 2006).  "Thus, a failure to establish sufficient evidence of discriminatory intent to

survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under § 1981." *Id.*; *see also Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . , and the factors justifying summary judgment dismissing [a plaintiff's] Title VII claim . . . for termination of his employment equally support the summary dismissal of his claims for termination brought under . . . § 1981.").

Because Plaintiff's Title VII claim is dismissed for failure to establish a genuine issue of material fact as to Defendant's discriminatory intent, *see supra* Section II.B, Plaintiff's Section 1981 claim is also dismissed.

D.  NYHRL

Having dismissed all of Plaintiff's federal claims, the Court must determine whether to exercise supplemental jurisdiction over Plaintiff's state law claim that Defendant violated the NYHRL by terminating him because of his race or national origin.  (Compl. ¶¶ 25-26.)

"The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."  28 U.S.C. § 1367(c)(3).  "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction."  *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (internal citations and quotation marks omitted).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court finds that nothing distinguishes the instant case from "the usual case." Plaintiff's federal claims are all dismissed prior to trial, and there is no reason to believe that judicial economy, convenience, or fairness would be served by this Court exercising supplemental jurisdiction over Plaintiffs' state law claim, and to do so would be inconsistent with the principle of comity.  Thus, Plaintiff's NYHRL claim is dismissed without prejudice to refiling in state court.  However, the Court notes that "Plaintiff's claims pursuant to the New York State Executive Law are subject to the same analysis as his . . . Title VII claims," *Frankel v. City of New York*, Nos. 06-CV-5450, 07-CV-3436, 2009 WL 465645, at *4 (S.D.N.Y. Feb. 25, 2009), and "[i]n light of the foregoing analysis of Plaintiff's Title VII claim, the Court has serious doubts about whether Plaintiff would be acting in good faith if he were to pursue his non-federal claims for [race and national origin] discrimination in state court," *Menes v. City Univ. of N.Y. Hunter Coll.*, 578 F. Supp. 2d 598, 620 n.18 (S.D.N.Y. 2008).

## III.  Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is granted.

Plaintiff's Title VII and Section 1981 claims are dismissed with prejudice.  Plaintiff's NYHRL

claim is dismissed without prejudice to refiling in state court.  The Clerk of Court is respectfully

directed to terminate the pending motion (Dkt. No. 34), to enter judgment for Defendant, and to

close this case.

SO ORDERED.

Dated:         August 4, 2009
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

25

Service List (by ECF):

Stephen Bergstein, Esq.
Bergstein & Ullrich, LLP
15 Railroad Avenue
Chester, NY  10918
steve@tbulaw.com

Amber L. Kagan, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178
akagan@morganlewis.com

Kirsten Milton Evans, Esq.
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, 5th Floor
Chicago, IL  60601
kirsten.evans@morganlewis.com